## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **CLAY MARSHALL CURTIS,** | ) | |
| | ) | |
| Petitioner, | ) | **Case No. 7:20cv00414** |
| | ) | |
| **v.** | ) | **MEMORANDUM OPINION** |
| | ) | |
| **COMMONWEALTH OF VIRGINIA,** | ) | By:   **Hon. Thomas T. Cullen** |
| | ) | **United States District Judge** |
| Respondent. | ) | |

Clay Marshall Curtis ("Curtis" or "Petitioner"), a Virginia inmate proceeding *pro se*, filed a petition for writ of habeas corpus under 28 U.S.C. § 2254, challenging his 2014 convictions in Warren County Circuit Court for first-degree murder and use of a firearm in the commission of a felony, for which he is currently serving a life sentence plus three years. The respondent has filed a motion to dismiss and amended motion to dismiss. As explained below, all of Curtis's habeas claims must be dismissed because they were not raised before the state courts, and because the state court's prior decision regarding the claim is neither contrary to clearly established federal law nor the product of unreasonable factfinding.

### I.   Factual Background and Procedural History

On December 10, 2014, Deputy Sheriffs in Warren County arrested Curtis for the December 9, 2014 murder of Simon Funk. On October 5, 2015, a Warren County grand jury indicted Curtis for first degree murder of Funk, in violation of Virginia Code § 18.2-32; use of a firearm in commission of a felony, in violation of Virginia Code § 18.2-53.1; possession of a firearm by a convicted violent felon, in violation of Virginia Code § 18.2-308.2; and attempted

murder of Jeff Sisler, in violation of Virginia Code §§ 18.2-26 and 18.2-32. CCR[1] at 8–9. The Warren County Circuit Court ordered Curtis held without bail until trial. *Id.* at 1–2, 17–18.

Curtis's trial counsel sought a psychiatric evaluation of Curtis to determine his sanity and the time of the offense and his competency to stand trial; the circuit court granted that request on January 12, 2016. Dr. David Rawls reviewed Curtis's medical and prison records and later evaluated Curtis himself. Dr. Rawls confirmed a previous diagnosis of posttraumatic stress disorder ("PTSD"), but he opined that Curtis did not suffer from any psychotic disorder. Dr. Rawls found that Curtis had a good understanding of the charges, the legal process, and the facts of his case, as well as the ability to communicate effectively with his lawyer. Accordingly, he found Curtis competent to stand trial.

Curtis's trial counsel then requested funds to hire a psychologist for more in-depth evaluation and possible use at trial or sentencing. The court approved $7,500, and counsel retained Dr. Sara Boyd. *Id.* at 94–97, 123–124. Dr. Boyd agreed with Dr. Rawls's PTSD diagnosis, secondary to Curtis's history of exposure to violence and threats of violence during prior incarceration. Although she did not find sufficient evidence of dissociative disorder or organic brain disorder, she did note that the then 63-year-old Curtis had developed toughness and violence as survival skills while incarcerated during most of his adult life, and she noted that he "was ill-equipped to make the transition from the demands of the prison environment . . . to the community." *Id.* at 207. His "problematic degree of institutionalization" was compounded by impulsivity and poor judgment. *Id.*

---

[1] Citations to the Record from *Commonwealth v. Curtis* in Warren County Circuit Court, Record No. CR15-607 and CR15-608—which includes all transcripts as well as pleadings and correspondence—will be abbreviated "CCR at #" using the page numbers in the lower right corner of each page in the record.

Counsel filed a notice of intent to introduce evidence from Dr. Boyd regarding Curtis's PTSD to negate the specific intent required for a first-degree murder conviction. The Commonwealth objected and filed a motion *in limine* to exclude the testimony, arguing that it was simply an effort to introduce a diminished-capacity defense, which is not recognized in Virginia. The trial court granted the Commonwealth's motion. *Id.* at 222–228, 384–385.

On Curtis's motion, the firearm charge was severed from the other charges, and the parties scheduled one week for a jury trial on the three remaining charges. *Id.* at 382. The trial began on June 26, 2017, and, over the next four days, the Commonwealth presented evidence from more than 30 witnesses, including 20 law enforcement officers, five forensic scientists, and a medical-legal investigator from the medical examiner's office, along with 59 exhibits. The evidence, as presented by the Commonwealth, told a horrific story.

Carla Elliott lived with her boyfriend, Simon Funk, and worked at the Front Royal Motel in Warren County, Virginia. Curtis was a guest living at the motel when Carla became friends with him in August or September of 2014. At the time, Curtis introduced himself as Frederick Cramer. She and Simon brought him dinner on a regular basis and gave him rides to various places, as needed. One time, Carla drove Curtis to Shenandoah Farms, about 20 minutes away, to pick up some Social Security paperwork from a relative. In exchange for the rides, Curtis purchased a $3000 used car for Carla and then loaned her $2100 for repairs to the car. He told her he had gotten the money in a small inheritance from his father. When Curtis moved to a different motel a couple of blocks away from the Front Royal Motel, Carla rented the room for him in her name because he had no identification, although he paid for the room. *Id.* at 1426–1433.

- 3 -

In November of 2014, Carla and Simon had Curtis over to their home for Thanksgiving dinner because he did not see much of his family. The next day, Curtis gave Simon $700 to help with the rent and with buying Christmas presents for Carla's son. About a week later, Curtis told Carla that someone had come into his room and stolen his money, so he could no longer afford to stay at the motel. He asked if he could stay with her and Simon. After discussing the request with Simon, Carla told him he could not live there.

A few days later, December 9, 2014, Simon returned from work around 5:30 p.m. to find some of Curtis's belongings on the front porch. Curtis then appeared and told Simon he still had more stuff at the motel and needed help removing his items and taking them to his niece's home in Shenandoah Farms, where he would be staying for a while. Curtis told Simon that Carla was going to drive him to his niece's. But Simon preferred that she not, so Simon agreed to drive him by the motel to pick up the rest of his belongings and then take him to Shenandoah Farms. They left in Simon's van. *Id.* at 1434–1438, 1453.

Arthur Clapp, a maintenance employee at the Relax Inn, testified that he recognized Curtis as someone who had lived at the motel in room 212 for three or four weeks. On December 9, 2014, Curtis checked out, but asked Clapp if he could leave some things at the front desk to pick up later. Around 6:00 in the evening, Clapp received a call from the manager, Mr. Patel, asking him to open room 212 for Curtis because Curtis still had some items to remove from the room.[2] Clapp opened the door and asked Curtis to shut it when he was done. Clapp later saw Curtis speaking to someone in the driver's seat of a van, but he did not see

---

[2] Patel testified that Curtis arrived in a van that evening and said he needed to get luggage out of his room, so Patel called maintenance to let him into the room. When he came back to the office, Curtis was gone. CCR at 1462–1478.

- 4 -

Curtis go back upstairs. Clapp later walked by room 212 and discovered that the door was open and that Curtis's belongings were still inside. But Curtis was nowhere to be found, so he secured the room.

At some point, Carla called Simon on his cellphone. Then, for reasons that are unclear from the trial transcript, she spoke to Curtis by phone and asked if he had a gun. When Curtis confirmed that he did have a gun, she asked him to put it away because he was scaring Simon. Fifteen minutes later, she called Simon and asked him to pick up some cigarettes for her when he was on his way home. A little while later, she tried calling both men again, but neither answered. She continued to try to reach them, to no avail. Sometime thereafter, she drove up to Shenandoah Farms to try to find them. As she got to the neighborhood, she saw several police cars in the grocery store parking lot. Because she had been drinking, she did not stop to talk to the police. After arriving home, she tried calling both Curtis and Simon again. She then called 911 to report Simon missing. Curtis eventually answered Simon's phone, but Carla could not remember whether that happened before or after she called 911. When she asked to speak to Simon, Curtis said, "Shut the fuck up, bitch. He's dead and I'm going to prison for the rest of my life." *Id.* at 1443.

Just after dark, while Carla was frantically trying to reach Simon and Curtis, Jeff Sisler, a resident in Shenandoah Farms, received a call from his neighbor Faye Curtis, Curtis's sister.[3] She said she was hearing strange noises in the woods behind her home and asked him to come over and check things out. He drove across the street to Faye's house and saw a van parked at the end of her driveway. Sisler parked behind the van, blocking it, and looked inside. He

---

[3] Faye Curtis passed away from cancer before the trial date and did not testify.

did not see anyone inside the van, so he walked to the front porch where Faye was standing with her phone in one hand and a gun in the other. While they talked, Sisler noticed a light— what appeared to be a flashlight—coming from the woods behind the detached garage and moving towards the van. He told Faye to call the police and quietly walked back to the van. Sisler then saw Curtis in the van; he recognized him because Curtis had previously lived with his sister. Nevertheless, he asked Curtis who he was. *Id.* at 1480–1486. Curtis responded in a nasty tone that Sisler perceived as threatening, saying, "I'm Clay Curtis. I've come to pay my sister a visit." *Id.* at 1486.

Curtis bent over as if picking up something from under his seat, and Sisler grabbed Curtis around the neck and told Curtis had better not be reaching for anything. Curtis raised his hands up and said he was leaving, but Sisler told Curtis that he could not leave because he was blocked in. Sisler then headed back up the driveway toward the house to speak to Faye when he heard the van accelerating behind him. Fearing that Curtis was trying to run him over, he jumped in between two pickup trucks parked at the top of the driveway. The van turned to the left and then ran into a firepit next to the driveway and hit a tree. Curtis jumped out and ran away. Sisler tried to pursue Curtis, but it was too dark for him to see. He again told Faye to call the police, because she was standing as if frozen with the phone in her hand and still had not called. He waited with her until the police arrived so that he could speak to them about what had happened. *Id.* at 1487–1519.

Numerous officers looked for the missing driver of the van. While they searched the woods and the nearby property, they found a disturbed area of ground. Upon closer

inspection, they saw a human hand sticking up from under the leaves. It was too dark to process the scene in the middle of the night, so they secured the scene and waited for daylight.

Later that evening or the next morning, one of the deputies encountered Curtis approximately one and a half miles from the scene. By that time, the officers had determined that the van was registered to Simon Funk and that a body was in Faye's backyard. Dispatch had previously relayed that Simon Funk had been reported missing, and that he had last been seen with Curtis, who sometimes used the name Frederick Cramer. When he was detained by the police, Curtis told the officers his name was Frederick Cramer.

Curtis claimed that he had borrowed the van from Simon's girlfriend, but he had not seen Simon in three days. He denied firing a gun that evening and said that he had not fired a gun in a long time. Using a gun-shot residue ("GSR") test kit, one of the officers on the scene swabbed Curtis's hands for primer residue. Curtis was then taken to the Warren County Sheriff's Office, advised of his rights,[4] and interviewed. His clothing and personal belongings, including his cell phone, were taken into evidence.

At around 8:00 the next morning, officers began processing the scene around the body. They were joined by Mary Stanley, a medical legal investigator with the medical examiner's office. The body was lying on its back and covered with a maroon comforter that looked like a comforter that was missing from one of the beds in room 212 of the Relax Inn.[5] The body

---

[4] Law enforcement officers are required to give prophylactic warnings before custodial interrogation of a suspect. *Miranda v. Arizona*, 384 U.S. 436, 479 (1966).

[5] Before Curtis was located and before Simon's body had been found, officers got permission from Carla Elliott to check room 212 at the motel, since the room was rented in her name. Upon entry, officers noticed that the top comforter was missing from one bed; the other bed had a maroon comforter on top. When they executed the search warrant, officers collected the maroon comforter from the room. CCR at 1389–1408. Later, the

had a gunshot wound in the lower right abdomen. When investigators rolled the body over, they discovered a wound behind the left ear. As Stanley rolled the body, a bullet fragment fell from either the hair or the hoodie, and the fragment was retrieved for evidence. The body was transported to the medical examiner's office in Manassas and was subsequently identified as the remains of Simon Funk. *Id.* at 1724–1787.

Police recovered numerous items from the van, the area around the body, and room 212, including a pair of eyeglasses, sunglasses, two bullet fragments, two spent cartridge casings, a stocking cap, winter gloves, a cell phone case, and a maroon comforter from room 212 that had been used to cover Simon's body.  Investigator Michael Henry obtained a warrant to access the material in Curtis's cell phone, where several pictures of a .40 caliber Ruger handgun were found, including one picture of Curtis holding the gun.[6] From one of the pictures, Henry was able to determine the serial number on the gun. Federal agents ran a trace on the serial number and identified a purchaser of the gun with that serial number, James Harris, who lived in Warren County near Shenandoah Farms. *Id.* at 2059–2106.

Officers visited Harris, who later testified that he had purchased the gun in July 2013 at Gander Mountain in Winchester. He did not like the size of the gun and decided to sell it, running an ad in the Valley Trader. Harris recalled that he had received a call from a man who identified himself as Dorian Hansen who wanted to buy the gun. They arranged to meet on the corner of Sligo Court and Kildare Drive (the road Faye Curtis lived on). Harris prepared

---

comforter was forensically compared with the maroon comforter discovered on Simon's body. *Id.* at 2241–2249.

[6] The gun itself was never found, although Lt. Bockey testified that he supervised a tracking team that tried to find the gun for three days after Funk's body was found. CCR at 1951–1956

a bill of sale for the gun and met Hansen, who presented a driver's license with the name Dorian Hansen, and signed the bill of sale. Harris testified that he had delivered the gun, in its original box, along with a box of .40 caliber Smith and Wesson ammunition. Harris later gave the officers the bill of sale and a bullet from another box of the same kind of bullets he had given Hanson. He also recalled that he had forgotten about a test-fired cartridge casing that Ruger had included in a manilla envelope in the box with the gun. Because he had forgotten about it, Harris had not given the test-fired casing to Hansen, so Harris gave it to the officers. Harris looked at a photo lineup at the Sheriff's office and identified Curtis—using the name Hansen—as the person who purchased the gun.

Julian Mason, a retired firearms examiner, testified that he had examined the bullet fragments, fired cartridge casings from the scene, and then test-fired casing from the gun that Harris had sold. He determined that the two bullet fragments—one found when Stanley rolled Simon's body over and the other removed from Simon's brain during the autopsy—were fragments from the same bullet, their fragmented edges matching perfectly together to create a full bullet. According to Mason, the unique markings on the bullet and on both casings from the scene were the same, and they matched the unique markings on the Ruger test-fired cartridge casing from the gun Harris had sold. *Id.* at 2294–2314.

No fingerprints of value were found on any items at the scene. *Id.* at 2165–2173. But four areas of blood on the cell phone case were consistent with Funk's DNA. Shalmay Smith, a DNA examiner with the Virginia Department of Forensic Science, testified that she performed statistical calculations to determine "the probability of randomly selecting unrelated individuals with that DNA profile," and that probability was "one in greater than 7.2 billion

in the Caucasian, Black, and Hispanic populations. 7.2 billion is, approximately, the world population." *Id.* at 2267–2268. The stocking cap had a DNA mixture, with Curtis as the major contributor, also with probability of the profile belonging to someone else being one in more than 7.2 billion. Finally, Curtis's blue jeans, taken from him at the Sheriff's Office on the morning of his arrest, had blood with a DNA profile that excluded Curtis, but matched Funk, again with probability of the profile belonging to someone else being one in more than 7.2 billion. *Id.* at 2251–2294.

The Commonwealth also established, through forensic evidence, that the comforter on Simon's body was made from the same fibers, same strands and stitching, and was the same color as the comforter from the second bed in room 212. Based on the tags, the comforters also appeared to be from the same manufacturer. The comforter on the first bed was missing when police executed the search warrant for the room in the early morning hours of December 10. *Id.* at 2241–2249. Testimony also established that the GSR test performed on Curtis was positive for primer residue on both his left and right hands. *Id.* at 2173–2240.

Finally, Mike Turner, an inmate from the RSW Regional Jail, testified that he met Curtis less than a month before the trial. Apparently, Turner was taken into custody in June 2017 after his wife left him. Turner testified that Curtis had confided in him and admitted to shooting Simon and putting his body in a blanket. *Id.* at 2318–2350.

After hearing all the evidence above (and more), the jury found Curtis guilty of the first-degree murder of Simon Funk and use of a firearm in committing a felony, but they found him not guilty verdict on of the attempted murder of Jeff Sisler. *Id.* at 577–579. Following the sentencing phase of the trial, the jury recommended a sentence of life for the murder Simon

Funk (plus a $100,000 fine) and the mandatory three years for use of a firearm. *Id.* at 583–584. On September 18, 2017, the trial court denied Curtis's motions to set aside the verdict and sentenced Curtis in accord with the jury's sentencing recommendation. The Commonwealth *nolle prossed* [7] the remaining charge of felon in possession of a firearm. *Id.* at 2681. The final judgment order was entered September 29, 2017. *Id.* at 727–729.

Curtis appealed to the Court of Appeals of Virginia, raising five assignments of error, including sufficiency of the evidence to support his conviction. On August 16, 2018, the Court of Appeals denied his appeal by per curiam opinion. *Id.* at 777. A three-judge panel of that court then denied his appeal on November 1, 2018. *Id.* at 814. The Virginia Supreme Court refused his petition for appeal on June 11, 2019. *Id.* at 815. Curtis did not petition for certiorari from the United States Supreme Court, nor did he file a state petition for habeas corpus.

Curtis timely filed his § 2254 petition in this court on April 21, 2020. He amended his petition on May 18, 2020, and raises the following issues:

1.  Ineffective assistance of counsel for failing to get mental health evaluation and treatment for Curtis, thereby denying him the right to decide for himself whether to testify and obtaining a conviction by unconstitutional duress;

2.  Denial of due process by trying and convicting him while incompetent to stand trial and not instructing the jury on the insanity defense because of his mitigating mental state; and

3.  Denial of due process by convicting him on insufficient evidence in an unfair trial with erroneous procedures, false and unreliable witnesses, and circumstantial evidence.

---

[7] "Nolle pros," a shortened form of the Latin phrase "nolle prosequi," refers to the Commonwealth's decision to dismiss the charges.

(Am. Pet. at 16–18 [ECF No. 3].) Curtis also claims actual innocence, apparently as a freestanding claim. (*See id.* at 18.)

## II. Standard of Review and Limitations on Federal Habeas

A federal court may grant a petitioner relief from a state court judgment under § 2254 "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Federal courts reviewing constitutional claims adjudicated on the merits in state court may grant relief on such a claim only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). A federal district court reviewing a § 2254(a) petition is also limited by the separate but related doctrines of exhaustion, procedural default, and independent and adequate state law grounds. The standard of review and these procedural doctrines promote the principles of finality, comity, and federalism, recognizing a state's legitimate interests in enforcing its laws, preventing disruption of state judicial proceedings, and allowing states the first opportunity to address and correct alleged violations of a state prisoner's federal rights. *Coleman v. Thompson*, 501 U.S. 722, 730–31 (1991).

### A.  Exhaustion

A habeas petitioner is required to exhaust his claims in state court before his claims can be considered in federal court. 28 U.S.C. § 2254(b)(1)(A). To exhaust his claims, a petitioner must present his federal constitutional claims to the highest state court, on the merits, before he is entitled to seek federal habeas relief. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).

Further, the petitioner must present to the state court the same operative facts and the same controlling legal principles that he seeks to present to the federal court. *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995); *Kasi v. Angelone*, 300 F.3d 487, 501–02 (4th Cir. 2002). Failure to do so "deprives[s] the state courts of an opportunity to address those claims in the first instance." *Coleman*, 501 U.S. at 732.

B.  Procedural Default

A separate but closely related issue is the doctrine of procedural default. If a state court has clearly and explicitly denied a petitioner's claim based on a state procedural rule that provides an independent and adequate ground for the state court's decision, that claim is procedurally defaulted for purposes of federal habeas review. *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998). A state procedural rule is independent if it does not depend on a federal constitutional ruling, and it is adequate if it is firmly established and regularly applied by the state court. *Yeatts v. Angelone*, 166 F.3d 255, 263–64 (4th Cir. 1998). A claim that has not been presented to the highest state court and would be procedurally barred as untimely or successive if the petitioner tried to present the issue to the state court is considered simultaneously exhausted and defaulted. *Bassette v. Thompson*, 915 F.2d 932, 936–37 (4th Cir. 1990).

C.  Overcoming Procedural Default

Before a federal habeas court will consider a procedurally defaulted claim, the prisoner must show both cause for the default and actual prejudice as a result of the claimed federal violation. *Coleman*, 501 U.S. at 750. Cause for procedural default requires the existence of some objective factor, external to the defense and not fairly attributable to the prisoner. *Id.* at 756–57. To show prejudice to overcome procedural default, a petitioner must show that the claimed

violation worked to his "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982).

### III.   Analysis of Claims

A. Ineffective Assistance of Counsel—Failure to Secure a Mental Health Evaluation

Because Curtis did not present his claim for ineffective assistance of counsel to the Supreme Court of Virginia and the time to do so has passed, this claim is simultaneously exhausted and defaulted. *Bassette*, 915 F.2d at 936–37. Curtis explains that he failed to file his ineffective assistance of counsel claim because he had an impaired mental state and that counsel's performance was "not fully developed." (Am. Pet. at 16.) Neither argument establishes cause for his default.

First, ineffective assistance claims cannot be raised on direct appeal in Virginia but must be raised in state habeas proceedings. *Dowdy v. Commonwealth*, 686 S.E.2d 710, 717 (Va. 2009); *Lenz v. Commonwealth*, 544 S.E.2d 299, 304 (Va. 2001). Under Virginia Code § 8.01-654(2), a state habeas petition must be filed within two years of the final order in the trial court or within one year from final disposition of the direct appeal in state court. The trial court's judgment was entered on September 29, 2017, and the final disposition of Curtis's direct appeal was effective on June 11, 2019. Thus, the latest Curtis could have filed his state habeas petition was June 11, 2020. Rather than filing a state habeas petition, Curtis filed his federal habeas in April 2020, without filing one in the state court. Had he filed in state court in April 2020, the petition would have been timely, but he skipped that step altogether. He was fully aware of counsel's performance—and its alleged inadequacy—in time to raise and exhaust his claim. Accordingly, there is no cause for failing to do so.

As for his "impaired mental state," the only evidence regarding Curtis's mental capacity that is available to the court is the evaluation report from Dr. David Rawls and the report and testimony of Dr. Sara Boyd. In finding Curtis competent to stand trial, Dr. Rawls noted that medical records from the BOP during a prior incarceration indicated a diagnosis of posttraumatic stress disorder ("PTSD"). Rawls agreed that Curtis's history was consistent with PTSD, but that there was no evidence of major psychiatric disorder, such as "delusions, hallucinations, [or] disordered thought processes." *Id.* at 87. Dr. Boyd, hired by Curtis, agreed that the diagnosis of PTSD was appropriate, but she found no evidence that Curtis suffered from organic brain disease or dissociation. But he did suffer from institutionalization, having been incarcerated most of his adult life, and he exhibited impulsive behavior and poor judgment in response to Stress. (Dr. Curtis Rep., Gov. Ex. 9 [ECF No. 16-9].)

Curtis has offered no evidence that his impairment rises to the level of "profound mental incapacity" sufficient to excuse his default, such as institutionalization in a psychiatric facility or adjudged mental incompetence. *See United States v. Sosa*, 364 F.3d 507, 513 (4th Cir. 2004) (holding that "federal courts will apply equitable tolling because of a petitioner's mental condition only in cases of profound mental incapacity."). PTSD, impulsivity, and poor judgment, comparable to the schizoaffective disorder and general anxiety disorder in *Sosa*, do not constitute profound mental incapacity. *Id.* Further, Curtis was able to articulate coherent arguments in support of his federal petition by May 2020, which undermines the assertion that an impaired mental state prevented him from filing the petition in state court before June 11, 2020.

Nor can Curtis show prejudice from his default because, had he timely raised the claim in state court, he could not have prevailed as a matter of law. To establish a claim for ineffective assistance of counsel, a petitioner must show (1) that counsel's performance was so deficient that he was not functioning as counsel guaranteed by the Sixth Amendment *and* (2) that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Curtis cannot show either.

Curtis claims his counsel was ineffective because he never got a mental health evaluation or treatment for Curtis; this is simply not true. As discussed in detail above, not only did trial counsel request a court-ordered evaluation of Curtis's competence to stand trial and his mental state at the time of the offense, counsel also requested and received $7500 for additional evaluation by Dr. Boyd. Both Dr. Rawls and Dr. Boyd evaluated Curtis, and neither psychologist found him incompetent. There was no failure to get a mental health evaluation; in fact, there were two evaluations. There is no deficient performance.

The Fourth Circuit's decision in *McWee v. Weldon* is instructive here. 283 F.3d 179, 186 (4th Cir. 2002). In *McWee*, the court found McWee's claim for ineffective assistance of counsel to be without merit when he was evaluated for competency twice before trial and found competent each time, and his communications with counsel and trial testimony were lucid and rational. *Id.* The same can be said for Curtis. In addition to being twice found competent, when he was arraigned in court, Curtis's answers were appropriate and courteous. CCR at 1178–1183. Curtis answered appropriately when asked about his decision to testify or not testify, *id.* at 2427–2428, and he spoke appropriately at his allocution, *id.* at 2675–2676.

- 16 -

For this reason, even if Curtis had raised his ineffective assistance of counsel claim in a state habeas proceeding, the claim would not have been successful because Curtis could not show that counsel's performance was deficient or that counsel's alleged ineffectiveness prejudiced him in any way. Because the court finds neither cause nor prejudice, Curtis has not overcome the procedural default for this claim.

B. Due Process Violation—Tried While Incompetent

For the same reasons, Curtis has not established any good cause to excuse his failure to raise his Due Process/competency argument on direct appeal. Even if he had filed a state habeas petition, due process claims *must* be raised in the trial court and on direct appeal or they will be procedurally defaulted. Curtis did not pursue a due process claim regarding his competence to stand trial in the trial court or on appeal. Any attempt to raise it in a state habeas two years ago or now would result in a determination that the issue has been procedurally defaulted under Rule 5A:18 of the Rules of the Supreme Court of Virginia because it was not raised in the trial court. *Yeatts v. Angelone*, 166 F.3d 255, 262 (4th Cir. 1999). Judicial economy strongly favors a disposition on the ground of procedural default.

As with the prior issue, Curtis cannot demonstrate prejudice—as a factual or legal matter. As discussed above, Curtis was competent to stand trial.

A corollary to Curtis's due process argument is that the jury should have been instructed on the insanity defense and told that they could not convict him of murder if they found he had a "mitigating mental state." The problem with this argument is that it is not an accurate statement of Virginia law. The trial court disallowed the evidence of Curtis's reduced capacity because the proffered evidence did not comply with state law. Under Virginia law,

evidence of diminished mental capacity—and any other mental condition that does not meet the legal definition of insanity—is not admissible at the guilt phase of a trial. *Stamper v. Commonwealth*, 324 S.E.2d 682, 699 (Va. 1985). In other words, evidence related to mental capacity in Virginia is subject to an all or nothing approach; unless a defendant's diminished mental capacity renders him criminally insane, evidence related to that condition is inadmissible at trial. *See Johnson v. Commonwealth,* 824 S.E.2d 14, 18 (Va. Ct. App. 2019); *Schmuhl v. Commonwealth*, 818 S.E.2d 71, 80 (Va. Ct. App. 2018); *Peeples v. Commonwealth*, 519 S.E.2d 382, 384 (Va. Ct. App. 1999). Virginia follows the common-law approach that adopts a constant standard for mental competence. A person who falls outside that line is considered legally insane, but everyone else is presumed to be responsible for their own crimes. *Id.* Because that is state law, it is not cognizable on habeas review. "It is not the province of a federal habeas court to reexamine state-court determinations on state law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).

Because Curtis cannot establish either cause or prejudice for his default of this claim, and because his argument is not cognizable on habeas review, he cannot overcome his default.

C. Sufficiency of the Evidence

Sufficiency of the evidence is the one claim Curtis makes in this court that was properly exhausted by presenting to the Supreme Court of Virginia on direct appeal. The written per curiam opinion of the Court of Appeals is the last reasoned state court opinion; thus, this court "looks through" the Supreme Court of Virginia's refusal of the appeal and reviews the reasoning of the Court of Appeals. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders

upholding that judgment or rejecting the same claim [are presumed] to rest upon the same ground." *Id.* The deference to a state court's decision, as required by 28 U.S.C. § 2254(d), must now be applied to the state court's decision.

The United States Supreme Court has recognized that sufficiency of the evidence to support a conviction beyond a reasonable doubt is a constitutional due process claim. *Jackson v. Virginia*, 443 U.S. 307, 322 (1979). The claim can be granted only if the evidence at trial, in the light most favorable to the prosecution, is such that no rational trier of fact could have found guilt beyond a reasonable doubt. *Id.* That is the same standard used by the Court of Appeals of Virginia in its opinion. CCR at 785. Thus, the state court has reasonably and correctly determined the applicable federal law. This federal court is required to defer to that reasonable opinion under 28 U.S.C. § 2254(d)(1)–(2) unless the law is applied unreasonably to the facts of the case or the court's findings of fact are unreasonable.

Sufficiency claims rarely prevail in federal cases arising out state convictions because the jury's verdict is subject to "two layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012). First, on direct appeal, the appellate court must defer to the decisions of the jury because the jury is responsible for determining what the facts are and what witnesses to believe; the appellate court cannot substitute its opinion for the jury's simply because the appellate judges would have decided the case differently. Likewise, once the state's high court has decided that the evidence was sufficient to support the jury's verdict, the federal habeas court must defer to the state court's decision. *Id.* The habeas court cannot issue a different decision just because it disagrees with the state court decision or even if the state court decision is *wrong.* Relief can be granted only if the decision is objectively unreasonable, *id.*, and

unreasonableness is a substantially higher standard. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). The federal court must presume that the state court's factual findings are correct, a presumption that can only be overcome by "clear and convincing evidence." 28 U.S.C. § 2254(e).

Evidence to support a conviction may be direct or circumstantial. *United States v. Moody*, 2 F.4th 180, 189 (4th Cir. 2021). In reviewing the sufficiency of the evidence, the court must look at the evidence supporting the verdict and all reasonable inferences that can be drawn from that evidence. If there is any evidence that supports the decision and if it is believed by the factfinder, then the fact must be accepted; the habeas court must also disregard evidence that contradicts the evidence supporting the decision. The habeas court does not weigh the evidence or determine who to believe. *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982). If one witness says "X" and three witnesses say "Y," then the jury is free to accept "X" as truth. Neither the state appellate court nor the federal habeas can substitute their belief as to which witnesses are more believable or which evidence is more important.

Abundant evidence—both direct and circumstantial—supports Curtis's convictions. Carla Elliott, the victim's girlfriend, testified that her boyfriend, Simon, and Curtis left in Simon's van, with Simon driving. She talked to them on the phone, and Curtis admitted that he had a gun. Curtis was seen arriving at his motel in a van and talking to the van's driver. After not being able to reach her boyfriend, Curtis finally answered Simon's phone and told her that Simon was dead and that he—Curtis—would be going to jail for the rest of his life. The defense brought several challenges to Carla's credibility, including from her own sister, but at the end of the day, the jury apparently believed Carla's testimony, which included

Curtis's shocking admission that Simon was dead and that he would be going to jail for the rest of his life.

Moreover, evidence from Curtis's cell phone enabled officers to locate the original gun purchaser from the serial number. Those pictures certainly can be viewed as corroboration for Harris's testimony that he sold the gun to Curtis. The subsequent ballistics examination established that the bullet in Simon's head and two fired cartridge casings at the scene were shot from the same gun that Harris had sold to Curtis. The jury also heard that Curtis also had primer residue on his hands when the GSR kit was analyzed. The maroon comforter over Simon's body matched the comforter on the second bed in Curtis's motel room. If all this wasn't enough, the jury learned that DNA evidence from the blood stains on Curtis's jeans was conclusively linked to the victim. And an inference of guilt could be drawn from Curtis' actions: running from the van after crashing it, giving police a false name, and making false statements that he had not seen Simon in several days. [8]

In light of these damning facts, the state court's decision that the evidence was sufficient to support the convictions is reasonable. Accordingly, a federal habeas court may not grant relief on this claim.

D.  Actual Innocence

Curtis alleges that he is actually innocent of the crime for which he was convicted, citing *Schlup v. Delo*, 513 U.S. 298 (1995), but he does not appear to understand the nuances and limitations of an actual-innocence claim.

---

[8] In other words, the evidence of Curtis's guilt was overwhelming without considering the testimony of the jailhouse informant, Mike Turner.

First, there is no recognized freestanding federal claim of actual innocence. *Herrera v. Collins*, 506 U.S.390, 404–05 (1993) "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Id.* at 400. The trial is the primary vehicle for determining a person's guilt or innocence. Federal habeas proceedings are not intended to be a forum for defendants to relitigate guilt or innocence, only to remedy major constitutional violations occurring in the underlying proceeding. *Id.* at 416. The nature of Curtis's arguments—that the evidence was circumstantial and that witnesses lied—are arguments that ask the court to reweigh the evidence and make different credibility decisions than the jury made. These types of arguments are not cognizable on habeas review. *Marshall v. Lonberger,* 459 U.S. 422, 434 (1983) ("[Section] 2254(d) gives federal courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."); *Cagle v. Branker*, 520 F.3d 320, 324 (2008) (noting that "federal habeas courts have no license to redetermine credibility of witnesses observed by the state trial court, but not by them.")

But compelling new evidence of actual innocence can open a narrow gateway through which a petitioner can pass to argue the merits of an otherwise untimely or procedurally defaulted—but meritorious—constitutional claim. *Schlup,* 513 U.S. at 316. To qualify for this gateway, the petitioner must show that, with the new evidence, it is more likely than not that no reasonable juror would find the petitioner guilty beyond a reasonable doubt. *Id.* at 327.

This also requires *new* reliable evidence, exculpatory scientific evidence, physical evidence, or a trustworthy eyewitness. *Id.* at 324. Evidence is only new if "it was not available

at trial and could not have been discovered through the exercise of due diligence." *Amrine v. Bowersox*, 238 F.3d 1023, 1028 (8th Cir. 2001); *see also Hubbard v. Pinchak*, 378 F.3d 333, 341 (3d Cir. 2004); *Hancock v. Davis*, 906 F.3d 387, 390 (5th Cir. 2018), *cert. denied*, 139 S. Ct. 2714 (2019); *Rowe v. Clarke*, No. 7:18CV00383, 2019 WL 4235240 (W.D. Va. Sept. 6, 2019) (noting that the Fourth Circuit has not addressed this issue). Curtis has not presented any such new evidence, so the actual innocence gateway is not available for him. And for the reasons discussed above, he does not have a meritorious constitutional claim related to the proceedings below.

## IV. Conclusion

For the reasons discussed above, the court will grant the respondent's motion to dismiss.

Further, when issuing a final order adverse to a § 2254 petitioner, the court must issue or deny a certificate of appealability. Fed. R. Gov. § 2254 Cases 11(a). A certificate of appealability may issue only if the movant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The movant must show that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further. *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003); *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000). In the context of a procedural ruling, the movant must demonstrate both that the dispositive procedural ruling is debatable and that the action states a debatable claim of the denial of a constitutional right. *Gonzales v. Thaler*, 565 U.S. 134, 140–41 (2012). Curtis has not made such showings in this case, so a certificate of appealability will be denied.

The clerk is directed to send copies of this Memorandum Ppinion and accompanying Order to petitioner and all counsel of record.

**ENTERED** this 14th day of October, 2021.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE